ACCEPTED
12-14-00130-cr
TWELFTH COURT OF APPEALS
TYLER, TEXAS
2/20/2015 2:35:06 PM
CATHY LUSK
CLERK

CAUSE NO. 12-14-00130-CR

IN THE

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS

THE 12th DISTRICT COURT OF APPEALS 2/20/2015 2:35:06 PM

CATHY S. LUSK
Clerk

FOR THE

STATE OF TEXAS

JAWORSKI ADKINS,

APPELLANT

V.

THE STATE OF TEXAS,

APPELLEE

## STATE'S REPLY TO APPELLANT'S BRIEF

D. MATT BINGHAM
Criminal District Attorney
Smith County, Texas

MICHAEL J. WEST
Assistant Criminal District Attorney
Bar I.D. No. 21203300
Smith County Courthouse
100 N. Broadway
Tyler, Texas 75702
ph:  (903) 590-1720
fax: (903) 590-1719
mwest@smith-county.com

**ORAL ARGUMENT NOT REQUESTED**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

REPLY TO APPELLANT'S POINTS OF ERROR . . . . . . . . . . . . . . . . . . . . . . 2

COUNTERPOINT ONE: The evidence in this case was legally
sufficient to establish the each and every element of the offense
alleged by the indictment (Response to Points of Error One
& Two) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

COUNTERPOINT TWO: The judgment in this case correctly reflects
an affirmative finding of Appellant's use of a deadly weapon that
is supported by the record and the jury's verdict. (Response to
Point of Error Three) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# INDEX OF AUTHORITIES

**STATUTES**         **PAGE**

**TEX. PENAL CODE ANN. (Vernon 2014)**

§ 1.07 (a) (17) (B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
§ 29.01 (1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
§ 29.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 18
§ 29.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19

**FEDERAL CASES**         **PAGE**

*Jackson v. Virginia*, 443 U.S. 307,
99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

**STATE CASES**         **PAGE**

*Bilbrey v. State*, 594 S.W.2d 754
(Tex.Crim.App. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Brooks v. State*, 323 S.W.3d 893
(Tex.Crim.App. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Brown v. State*, 704 S.W.2d 506
(Tex.App. - Dallas  1986, *pet. ref'd*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Carrillo v. State*, 98 S.W.3d 789
(Tex.App. - Amarillo 2003, *pet. ref'd*) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Davis v. State*, 897 S.W.2d 791
(Tex.Crim.App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Escobar v. State*, No. 2-08-352-CR, 2010 Tex.App. LEXIS 2783
(Tex.App. - Fort Worth Apr. 15, 2010, *no pet.*)
(not designated for publication) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**STATE CASES** (cont.)                                                                  **PAGE**

*Hinton v. State*, No. 05-03-01125-CR, 2004 Tex.App. LEXIS 4927
(Tex.App. - Dallas June 2, 2004, *no pet.*)
(not designated for publication) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hooper v. State*, 214 S.W.3d 9
(Tex.Crim.App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Lafleur v. State*, 106 S.W.3d 91
(Tex.Crim.App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Lancon v. State*, 253 S.W.3d 699
(Tex.Crim.App. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Malik v. State*, 953 S.W.2d 234
(Tex.Crim.App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Miles v. State*, 204 S.W.3d 822
(Tex.Crim.App. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Morales v. State*, 633 S.W.2d 866
(Tex.Crim.App. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Newland v. State*, 882 S.W.2d 659
(Tex.App. - Beaumont 1994, *no pet.*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Polk v. State*, 693 S.W.2d 391
(Tex.Crim.App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Ramos v. State*, No. 01-12-00957-CR, 2014 Tex.App. LEXIS 113
(Tex.App. - Houston [1st Dist.] Jan. 7, 2014, *no pet.*)
(not designated for publication) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Webber v. State*, 757 S.W.2d 51
(Tex.App. - Houston [14th Dist.] 1988, *pet. ref'd*) . . . . . . . . . . . . . . . . . . . . . 18

CAUSE NO. 12-14-00130-CR

IN THE

THE 12th DISTRICT COURT OF APPEALS

FOR THE

STATE OF TEXAS

---

JAWORSKI ADKINS,

APPELLANT

V.

THE STATE OF TEXAS,

APPELLEE

---

**STATE'S REPLY TO APPELLANT'S BRIEF**

---

**TO THE HONORABLE COURT OF APPEALS:**

Comes now the State of Texas, by and through the undersigned Assistant

District Attorney, and prays that the Court to overrule Appellant's alleged errors and

affirm the judgment and sentence of the trial court in the above-numbered cause.

**STATEMENT OF THE CASE**

Appellant, Aaron Clement, was indicted in Cause No. 114-1676-13, filed in the

114th District Court of Smith County, Texas, with the offense of Aggravated Robbery.

1

(CR: 1). Appellant was convicted by a jury of the offense alleged by the indictment and the same jury subsequently assessed a term of twenty-two (22) years confinement in the Texas Department of Corrections - Institutional Division and no fine. (RR 12: 62).

Appellant gave timely notice of appeal, counsel was appointed, and a brief was filed with the Court. The State's brief will be timely filed if received by the clerk of the Court on or before February 20, 2015.

## STATEMENT OF FACTS

Appellant has accurately stated the essential nature of the evidence presented at his trial. In the interest of judicial economy, any other facts not mentioned herein that may be relevant to Appellant's point will be discussed in the State's argument.

## REPLY TO APPELLANT'S POINTS OF ERROR AND SUMMARY OF ARGUMENT

**COUNTERPOINT ONE: The evidence in this case was legally sufficient to establish the each and every element of the offense alleged by the indictment. (Response to Points of Error One & Two)**

### A.    Summary of Argument

Under his first two points of error, Appellant complains that the evidence at his trial was insufficient to prove beyond a reasonable doubt that he committed the offense of Aggravated Robbery (Point of Error One) and that he used or exhibited a deadly weapon during commission of the robbery. (Point of Error Two). (Appellant's

2

brief at 4-8). However, the record of this case establishes that Appellant committed a bold daytime theft in front of several witnesses and during the course of committing this theft he exhibited a handgun as a threat to discourage any pursuit as he left the scene.

## B. Legal Sufficiency Review Standard

In determining legal sufficiency, the Court should review all of the evidence in the light most favorable to the jury's verdict to decide whether any rational jury could have found the essential elements of offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex.Crim.App. 2010) *citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). The Court should examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007) *citing Jackson*, 443 U.S. at 318-19.

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of

proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* Furthermore, the jury is considered the sole judge of the credibility of witnesses and is thus free to accept or reject some, all, or none of the evidence presented by either side. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex.Crim.App. 2008).

## C.  Aggravated Robbery

Under the Texas Penal Code provisions relevant to this case, a person commits Robbery "if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." TEX. PENAL CODE ANN. § 29.02 (Vernon 2014). Aggravated Robbery occurs if the person, in the course of committing a robbery, "uses or exhibits a deadly weapon." TEX. PENAL CODE ANN. § 29.03 (Vernon 2014).

"Deadly weapon" means "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07 (a) (17) (B) (Vernon 2014). If the evidence supports a reasonable inference that the manner of the actor's intended use of the object was capable of causing death or serious bodily injury, it is sufficient to support a deadly weapon finding. *See Morales v. State*, 633 S.W.2d 866, 868-69 (Tex.Crim.App. 1982).

4

## D. Application to the Facts of the Case

In this case, the State had alleged and was required to prove that Appellant committed Aggravated Robbery as defined above, and that he used or exhibited a deadly weapon during the course of committing theft. TEX. PENAL CODE ANN. §§ 29.02, 29.03 (Vernon 2014). Appellant does not contest that the evidence in this case showed that he entered a convenience store and intentionally committed a theft of money and checks. (Appellant's brief at 7) ("There is no dispute that the offense involving [the victim named in the indictment] was a theft."). His complaint is only that the victim did not see him exhibit a handgun until after he left the store and was leaving the scene of the offense. *Id.* This claim completely ignores that the law provides "in the course of committing theft" is defined thusly:

> "In the course of committing theft" means conduct that occurs in an attempt to commit, during the commission, **or in immediate flight after the attempt or commission of theft.** (emphasis supplied).
>
> TEX. PENAL CODE ANN. § 29.01 (1) (Vernon 2014).

To that end, the jury heard the following testimony which was relevant to the State's proof of the exhibition of a deadly weapon in this case:

1. The State's first witness was **Ms. Claudette Phelps,** the victim named in the indictment. (RR 10: 15). Ms. Phelps told the jury that Appellant was a regular customer in the convenience store where she worked. (RR 10: 20). On the day of the

5

offense, Appellant came into the store during the daytime hours. (RR 10: 21). Appellant came into the store after parking by the gas pumps and asked to have a pump turned on. (RR 10: 22).[1] Another cashier was "cashing out" a register and laid the money on the counter next to the register before talking to Appellant. (RR 10: 24). Ms. Phelps heard the clerk repeatedly asking how much gas Appellant wanted and he refused to say, he then "reached over the counter, grabbed the money, and out the door he went." (RR 10: 24). The jury then heard the following testimony:

Q. How did he go out the door?

A. Casually. I mean, he didn't run. He just opened the door and walked out and went to his car.

Q. What did y'all do?

A. We went kind of crazy grabbing phones, trying to call 911. Darthia was going to go around the counter and one of the customers said, "Darthia, stop. He's got a gun." And she stopped. And I had the phone in my hand with 911 and I went -- we have big glass windows there in the front, and I went to the window to get a description of the car and I saw the gun.

Q. And tell me how you saw the gun.

A. Because he held it up like this (indicating).

Q. Where was he when he did that?

---

[1] The jury later heard during the punishment phase that employees of the store would not turn on the gas pump for Appellant without him first paying for the gas he wanted because he had driven off without paying twice before. (RR 11: 87, 90).

6

A.    He was in his car actually pulling away from the pumps. He held it up like this (indicating) and looked right at me.

(RR 10: 25).

Ms. Phelps continued with her testimony and explained to the jury that, "I was in shock. I couldn't believe he was displaying the gun. I mean, I got nervous. I'm on the phone with 911 trying to describe the car and all that and there you see the gun and . . ." (RR 10: 27). She also testified that it scared her to see the gun:

Q.    So when he's looking at you and he's got the gun up, were you scared?

A.    Yes, I was.

Q.    What were you scared of?

A.    He could pull the trigger.

Q.    All right. So you see him. He's looking at you. He's got the gun up. What do you do?

A.    I kind of backed away from the window.

(RR 10: 28).

The jury was then given an opportunity to watch the in-store video recording of the robbery. (RR 10: 30-33). She testified that when Appellant exhibited the gun that she was afraid that he would "pull the trigger" and "shoot us." (RR 10: 36).

Ms. Phelps agreed with Appellant's attorney on cross-examination that she did not see Appellant exhibit or carrying the gun while he was in the store and did not

7

hear him make any threats. (RR 10: 40-41). She also told the jury that when Appellant first went out the door, "Ms. Murray and I, we started around the counter to go after him, and that's when someone said he had a gun." She then explained that her intent was to catch Appellant and get the stolen money back - until she saw his gun:

> Q. Okay. Was it your intent to encounter him and make him give you the money back?
>
> A. Yes.
>
> Q. You were going to force him to give the money back?
>
> A. It wasn't his to take.
>
> Q. Well, my question is: Was it your intention to force him to give you the money back?
>
> A. Yes.
>
> (RR 10: 43).

On redirect, the jury heard Ms Phelps explain that she was in fear after seeing Appellant exhibit his gun:

> It scared me. I've had some incidents in my past where I worked in different convenience stores and customers come in and say a customer had a gun. And I had small children at that time, and my life is more important than - my children, like, I had to be there for my kids, so, yeah, it scares me.
>
> (RR 10: 47).

The State would submit that under the law the above testimony of Ms. Phelps, standing alone, was sufficient to establish that Appellant was "in immediate flight

8

after the attempt or commission of theft" when he exhibited a handgun and caused her to be afraid that he would shoot her. TEX. PENAL CODE ANN. § 29.01 (1) (Vernon 2014); *See Newland v. State*, 882 S.W.2d 659, 661 (Tex.App. - Beaumont 1994, *no pet.*) *citing Bilbrey v. State*, 594 S.W.2d 754 (Tex.Crim.App. 1980) ("To sustain a verdict of aggravated robbery, it must be shown that the appellant, while in the course of committing or attempting to commit theft [meaning conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft] of tangible or intangible personal property with the intent to obtain or maintain control of said property, intentionally or knowingly threatens or places another in fear of imminent bodily injury or death and uses or exhibits a deadly weapon.").

2. Nevertheless, the State's direct evidence continued with other witnesses recounting their involvement with the robbery. The next State's witness regarding Appellant's use and exhibition of a handgun during the robbery was **Ms. Darthia Murray**, another store employee. (RR 10: 51). She testified that she was taking extra cash and checks out of a register when Appellant came into the store and asked to have a gas pump turned on. (RR 10: 57). Ms. Murray recognized Appellant at the time because he was a regular customer of the store. (RR 10: 56). When told he would need to pay for the gas first, Appellant asked for a pack of cigarettes. (RR 10: 58).

9

Appellant then reached over the counter and grabbed the money that Ms. Murray had taken out of her register and walked out of the store. (RR 10: 60). Ms. Murray "came running around the counter" after Appellant to "try to get the money from [Appellant]." (RR 10: 60). She only stopped chasing Appellant when she heard a customer yell "Stop. he's got a gun." (RR 10: 61). She told the jury that she ended her pursuit because Appellant had a gun and "[y]ou could get killed." (RR 10: 61).

3.     Next, the State presented **Ms. Brittany Walker**, a customer who was present at the time of the robbery. (RR 10: 81-82). She heard Appellant talking to Ms. Murray about gas and cigarettes while Appellant looked "agitated." (RR 10: 86). Then, "they quit talking, and [Appellant] looked around and then he reached over the cash register, grabbed the money and then headed to his car." (RR 10: 87). She testified that "when he walked out, somebody said, 'He has a gun,' and then he waved the gun and then drove off." (RR 10: 87). Ms. Walker explained what she saw outside:

A.     I saw him having a little silver gun, and he was waving it like this (indicating).

Q.     Where was he when you saw the gun?

A.     He was in his driver's seat.

Q.     Could you tell where he was looking when he did that?

A.     Looking at the store.

(RR 10: 88).

10

Not surprisingly, this witness was "in shock" when she saw Appellant exhibit the gun. (RR 10: 89). Ms. Walker's testimony also corroborated that of the two store employees who stated that pursuit of Appellant ceased in response to Appellant's displaying his gun:

Q. Okay. As he - as he was walking to the car, what was Ms. Murray doing?

A. She was telling us to stop him, and then she walked out the door, or was heading to the door.

Q. Did she actually go outside?

A. She almost did until they said, "He's got a gun."

Q. Okay. So who said that?

A. I never saw who said that.

Q. Somebody inside the store?

A. Yes.

Q. Okay. At this point in time, when you heard the person say, "He's got a gun," did you see a gun?

A. Yes.

(RR 10: 99).

Ms. Walker also told the jury that she was concerned when she saw Appellant's gun because her two-month-old son was with her and she feared he might be harmed where "you never know people these days." (RR 10: 105-06).

11

On cross-examination, Ms. Walker explained she was concerned because, although Appellant did not point the gun at the people in the store, or verbally threaten anyone with it, "you [could] tell in his eye that he was - if somebody would have walked out there, he might have shot somebody." (RR 10: 107).

4.      The State then called **Ms. Tawni Spencer**, another customer who witnessed the robbery. (RR 10: 108-11). She said that she was in a line with Appellant while he was arguing with a clerk. (RR 10: 110-11). The jury heard her recall:

Q.      Did you see anything out of the ordinary that happened after the argument?

A.      What caught my eye was the monitor as the - I guess the cash register is what they call it - was moving. And as it started moving, I looked over, his arm was on the other side of it. He grabbed a wad, looked to me like money and paper, and he turned around and just walked out the door. And as he walked out the door, the clerk was coming around. And a lady had already run out behind his vehicle, I'm assuming to get the license plate number. At this point, he had already gotten in his vehicle and raised up a shiny gun. I'm not good with guns. I don't know what it was. I know it was a handheld gun. And turned around and looked at everybody. And I started hollering, "He's got a gun." I grabbed her as she was running around, and that's when everybody just kind of backed away from the windows.

(RR 10: 112).

This witness also explained that Appellant's vehicle was sitting at the gas pumps with "the nozzle thing was already in his vehicle. I'm assuming he had not

gotten gas. And it was still in the vehicle. As he drove off it yanked out." (RR 10: 114). She described Appellant while he was exhibiting the gun as ". . . looking at everybody in the store almost like he was daring them to come out of the store." (RR 10: 115, 120). Ms. Spencer told the jury that when she saw Appellant's gun she "screamed, 'He's got a gun. Get down,'" because she was "scared for [her] life." (RR 10: 116). Appellant's question here concerning whether the State proved that he used or exhibited a deadly weapon during the course of committing theft was then directly answered by this witness:

Q. I think you said earlier that it appeared to you Ms. Murray was running out after him?

A. Yes.

Q. Why did you stop her?

A. When I leaned over - as she was running, I leaned over, saw that he had the gun, and I screamed, "gun." And as she was coming around, I stopped her.

Q. Why did you stop her?

A. I didn't want her to get shot.

Q. So you're afraid if she continued out after him, he would shoot her?

A. Obviously he was going to do something with it or he wouldn't have held it up.

13

Q. You said he held a gun up and waved it around. Did he point it at the store or was it just -

A. When I seen it, he was pointing it like this, like, daring somebody to come out. He didn't directly point it at no one.

Q. How did you take that?

A. As a threat.

Q. So when he waved that gun around, you took it, you said earlier, as daring people to come outside after him?

A. Yes.

Q. So would you have taken that as - waving a gun around as a threat saying, "Don't come after me"?

A. Yes.

Q. He had just stolen property from the store?

A. Yes.

(RR 10: 122-23).

5.      The State called another customer at the store, **Ms. Tracie Bradshaw**, to testify concerning the robbery. (RR 10: 128-29). She was in the store when Appellant grabbed the money and began walking out while people were yelling. (RR 10: 130-32). Ms. Bradshaw testified that after Appellant got into his vehicle:

> He was looking back towards the store, because the way his car was, he was right by the store. And he was looking and did like a nodding motion. And I kept staring at him. And he picked a gun up and was saying something - I couldn't hear him - but he was doing his head like

14

that (indicating). Then he put it down and then he picked it up again and did it like that (indicating) and then he put it down and he left.

(RR 10: 133-34).

Appellant then ". . . left pretty fast. He still had the gas thing in his car, so when he left, it shot up in the air." (RR 10: 135). On cross-examination it appears that where this witness was "indicating" in the testimony quoted above she was showing the jury that Appellant did a "cocking motion" with the gun when he exhibited it to the people in the store:

> Q. Okay. And then after he was there for a second or so, that's when you saw him raise -
>
> A. Yes.
>
> Q. - the object? Okay. And do, what you said, was the cocking motion?
>
> A. Yes.
>
> Q. And then what did he do?
>
> A. Well, he didn't immediately do the cocking. He just held it up and still was - I'm not sure what he was saying. I would say mouthing words. Looking. But he did that, and then he put it down, and then he picked it up and he did the cocking motion. So - I'm sorry. Then he put it back down, and then he left.
>
> (RR 10: 138).

6. After these eye-witnesses testified, the State presented **Lindale Police Officer James Burnette** as its next witness. (RR 10: 143). He was dispatched to be on the

15

look out for Appellant's vehicle after the robbery. (RR 10: 147-48). Officer Burnette soon thereafter saw the vehicle and pulled it over. (RR 10: 148-50). Because he was alerted that a gun had been used in the robbery, Officer Burnette conducted a "felony stop" on the vehicle which included him approaching with his weapon drawn. (RR 10: 150). The officer recovered a "big wad of money and some checks" from Appellant's person. (RR 10: 152). Although Officer Burnette was not involved in a search of Appellant's vehicle, he was aware that firearms were later recovered from it by other police officers. (RR 10: 157). The jury also heard from Officer Burnette that a firearm is a "deadly weapon" that is "capable of causing death or serious bodily injury." (RR 10: 153).

7.     The next witness who provided evidence regarding Appellant's use of a gun to commit this robbery was **Lindale Police Sergeant Jeffrey Chad McElyea**. (RR 10: 189). He was dispatched to the robbery scene and initially began taking statements from the witnesses until Appellant's vehicle had been stopped roughly ten minutes after he arrived at the store. (RR 10: 191-92, 194). A subsequent search of Appellant's person revealed that he was not carrying a weapon, but Appellant stated that his weapons were in the car. (RR 10: 196). Sgt. McElyea later found two unloaded handguns in Appellant's vehicle when it was searched, "a chrome-colored pistol, and the other one was a small .22-caliber revolver." (RR 10: 196-98). The jury was told

16

that both of the handguns were "capable of causing death and serious bodily injury." (RR 10: 201).

Sgt. McElyea would later interview Appellant at the police station and the jury was given a recording of that interview to watch. (RR 10: 206-07). According to the Sergeant, during the interview Appellant "was cooperative. He was displaying some aggravation, I guess, towards the gas station attendants, but he was very cooperative." (RR 10: 208). Appellant also "admitted he did [the robbery] because they didn't turn the gas pumps on for him and he was angry. Of course, he denied the firearm." (RR 10: 209). Sgt. McElyea explained to the jury that the "chrome-colored" pistol recovered from Appellant's vehicle was "the one the witnesses said they had saw that he had pointed up and displayed when they approached him." (RR 10: 224). After the testimony of Sgt. McElyea, both the State and the defense rested their respective cases. (RR 10: 229).

The evidence in the record of this case shows that it is undisputed that Appellant went into a convenience store and brazenly stole money and checks in front of several eye-witnesses. Appellant admitted as much to police during his interview. The record further shows that at least one clerk in the store began to give chase until warned by a customer that Appellant had a gun. Appellant held up the gun and made "cocking motions" with it or waived it around in a manner that seem to be daring

17

those inside to come out after him. His exhibition of the handgun caused the eye-witnesses to fear he would shoot anyone who came out after him and thus enabled him to get away with the money that he had just stolen. Appellant presented no evidence that significantly impeached any of the State's witnesses, particularly on their testimony concerning his threatening display of a firearm when leaving the scene.

The law provides that the trier of fact can infer criminal intent or knowledge from the words and conduct of the accused. *Brown v. State*, 704 S.W.2d 506, 507 (Tex.App. - Dallas 1986, *pet. ref'd*). The State may rely on circumstantial evidence to establish use of a weapon. *See Webber v. State*, 757 S.W.2d 51, 54 (Tex.App. - Houston [14th Dist.] 1988, *pet. ref'd*). And, as discussed above, a person commits aggravated robbery if, "in the course of committing theft" - which is specifically defined by the Penal Code as including "conduct that occurs . . . in immediate flight after the . . . commission of theft - he uses or exhibits a deadly weapon. TEX. PENAL CODE ANN. §§ 29.01, 29.02, 29.03 (Vernon 2014). The record shows that is exactly what happened in this case.

Additionally, Appellant's argument that this case represents a theft only fails under the express definition of "in the course of committing theft" which includes conduct occurring "in immediate flight after the . . . commission of theft." *Id.*; *see*

18

*also Hinton v. State*, No. 05-03-01125-CR, 2004 Tex.App. LEXIS 4927 (Tex.App. - Dallas June 2, 2004, *no pet.*) (not designated for publication) (evidence sufficient to support aggravated robbery conviction where store employee pursued defendant after he left the store without paying for merchandise and defendant "rummaged around in his car and produced a silver revolver and pointed it at him."); *Escobar v. State*, No. 2-08-352-CR, 2010 Tex.App. LEXIS 2783 (Tex.App. - Fort Worth Apr. 15, 2010, *no pet.*) (not designated for publication) (evidence sufficient to support aggravated robbery conviction where defendant while "in immediate flight after the commission of theft," displayed a box-cutter to enable his escape); *Ramos v. State*, No. 01-12-00957-CR, 2014 Tex. App. LEXIS 113, 36-37 (Tex.App. - Houston [1st Dist.] Jan. 7, 2014, *no pet.*) (not designated for publication) (aggravated robbery committed where after an attempted theft the defendant, while in "immediate flight" from the store, pulled a knife and threatened a pursuer as the offense was not yet complete at the time of the deadly weapon being exhibited.).[2]

For these reasons, there is no merit to Appellants first two points of error and they should be overruled.

---

[2] The State proffers unpublished opinions to point out the reasoning of the courts therein when faced with very similar facts "rather than simply arguing without reference, that same reasoning." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex.App. - Amarillo 2003, *pet. ref'd*).

19

**COUNTERPOINT TWO:** The judgment in this case correctly reflects an affirmative finding of Appellant's use of a deadly weapon that is supported by the record and the jury's verdict. (Response to Points of Error Three)

## A.     Summary of Argument

Appellant argues under his third point of error that the judgment in this case incorrectly reflects that an affirmative finding of the use of a deadly weapon was made where the issue of the use of a deadly weapon was not submitted to the jury. (Appellant's brief at 8-10). However, the evidence in the record, and the jury's verdict finding Appellant guilty of the aggravated robbery as alleged by the indictment, are sufficient to support the affirmative finding.

## B.     The Affirmative Finding of a Deadly weapon

Appellant asserts in his third issue that the trial court erred in making an affirmative deadly weapon finding in the court's written judgment without an express finding by the jury to a special issue on the use of a deadly weapon. The resolution of this issue is likely controlled by the Court of Criminal Appeals' holding in *Lafleur v. State*, 106 S.W.3d 91 (Tex.Crim.App. 2003). The Court in *Lafleur* reaffirmed its previous holding in *Polk v. State*, 693 S.W.2d 391 (Tex.Crim.App. 1985), that there must be an express finding of a deadly weapon when the jury is the factfinder. 106 S.W.3d at 92. However, the Court disagreed with its previous holding in *Davis v. State*, 897 S.W.2d 791 (Tex.Crim.App. 1995), by stating:

20

[C]ourts may look to the application paragraph of a lesser-included offense to determine if the express deadly weapon allegation in that portion of the jury charge matches the deadly weapon allegation in the indictment for the charged offense. If so, the trial court may enter a deadly weapon finding, in the judgment based upon the jury's verdict of guilt on the lesser-included offense.

*Lafleur*, 106 S.W.3d at 92.

The facts in *Lafleur* included that the jury acquitted the defendant of the charged offense of murder but convicted him of the lesser included offense of manslaughter. 106 S.W.3d at 92-93. The indictment in *Lafleur* alleged that the defendant "did then and there intentionally and knowingly cause the death of an individual, namely: Keith Walker, hereafter styled the complainant, by shooting the complainant with a deadly weapon, to-wit: a firearm." *Id.* at 92. The application paragraph contained in the jury charge for the lesser included offense of manslaughter read as follows:

> Therefore, if you believe from the evidence beyond a reasonable doubt that in Jefferson County, Texas, on or about May 31, 1998, the defendant Michael Winn Lafleur, did then and there recklessly cause the death of an individual, namely: Keith Walker, hereafter styled the complainant, by shooting complainant with a deadly weapon, to-wit: a firearm, you shall find the defendant guilty of the lesser included offense of Manslaughter.

*Id.* at 93.

The trial court thereafter entered an affirmative finding in its written judgment that the defendant used a deadly weapon. The Court in *Lafleur* decided that, if the

21

jury's verdict of a lesser included offense is based upon an application paragraph that explicitly and expressly requires the jury to find that the defendant used a deadly weapon in the commission of the offense, the underlying purpose of *Polk* has been achieved. *Id.* at 98.

Based upon this reasoning, the *Lafleur* Court determined that the combination of: (1) the indictment that alleged the use of a deadly weapon; (2) the application paragraph of the jury charge of the lesser included offense of manslaughter that required a finding, beyond a reasonable doubt, that the appellant used a deadly weapon; and (3) the jury's verdict that appellant was guilty of the lesser included offense of manslaughter, constituted an express finding that appellant used a deadly weapon to cause the victim's death. *Id.* at 99.

The very same kind of "combination" relied upon in *Lafleur* for an express finding on the use of a deadly weapon also exists in this case. The indictment here specifically alleged that Appellant used a deadly weapon and in its relevant part states that Appellant:

> . . . did then and there, while in the course of committing theft of property and with the intent to obtain or maintain control of said property, [did] intentionally and knowingly threaten or place Claudette Phelps in fear of imminent bodily injury or death, and the defendant did then and there use or exhibit a deadly weapon, to-wit: a firearm.

(CR: 1).

22

The indictment here further included a separate paragraph alleging that Appellant ". . . used or exhibited a deadly weapon, to-wit: a firearm, during the commission of or immediate flight from said offense." (CR: 1).

Similarly, the application paragraph regarding Aggravated Robbery in the jury's charge also required that the jury find beyond a reasonable doubt that Applicant used a firearm as a deadly weapon during commission of the offense before the jury could find him guilty of that charge:

> **Application of law to facts**: You must determine whether the State has proved beyond a reasonable doubt four elements. The elements are that: (1) the defendant in Smith County, Texas, on or about October 11th, 2013, intentionally or knowingly either (A) threatened Claudette Phelps with imminent bodily injury or death or (B) placed Claudette Phelps in fear of imminent bodily injury or death; and (2) the defendant did this in the course of committing theft of property owned by Claudette Phelps; and (3) the defendant had the intent to obtain or maintain control of the property that was the subject of the theft; and (4) **the defendant used or exhibited a deadly weapon, a firearm**.
>
> You must all agree on elements 1, 2, 3, and 4 listed above, but you do not have to agree on whether element 1 is proved by the methods listed in 1A or 1B above. If you-all agree the State has proved beyond a reasonable doubt each of the four elements listed above, you must find the defendant guilty. **If you all agree the State has proved beyond a reasonable doubt elements 1, 2, and 3, and that the State has failed to prove element 4 above, that the defendant used or exhibited a deadly weapon, a firearm, then you must find the defendant guilty of the lesser included offense of robbery.** (emphasis supplied)

(CR: 90; RR 11: 17-18).

23

Lastly, the jury found Appellant guilty of Aggravated Robbery "as charged in the indictment" and as previously explained in the application paragraph for that offense quoted above. (CR: 95). Consequently, the jury clearly made an express finding that Appellant used a deadly weapon in the commission of the offense of Aggravated Rrobbery under the holding in *Lafleur*.

Absent evidence to the contrary, this Court must assume that the jury followed the instructions as set forth in the jury charge. *See Miles v. State*, 204 S.W.3d 822, 827-28 (Tex.Crim.App. 2006). Accordingly, the jury's finding of guilt on the charge alleged by the indictment also constituted a finding that Appellant used a deadly weapon, "to-wit: a firearm"during the commission of the offense. There is thus no error requiring a reformation of the judgment in this case where the affirmative finding regarding the use of a deadly weapon is supported by the charge and the jury's verdict. *Lafleur*, 106 S.W.3d at 92.

For these reasons, Appellant's third point of error has no merit and should be overruled.

## PRAYER

**WHEREFORE,** for the reasons stated herein, the State of Texas prays that the Court of Appeals overrule Appellant's Points of Error and affirm the judgment of the 114th District Court, Smith County, Texas, in this case.

Respectfully submitted,

D. MATT BINGHAM
Smith County Criminal District Attorney

Michael J. West
Asst. Criminal District Attorney
Bar I.D. No. 21203300
100 N. Broadway, 4th Fl.
Tyler, Texas 75702
(903) 590-1720
(903) 590-1719 (fax)

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the pertinent sections of the State's Reply Brief in the above numbered cause contain 5,386 words, an amount which complies with Texas Rule of Appellate Procedure 9.4.

Michael J. West
Asst. Criminal District Attorney
Bar I.D. No. 21203300

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this _20th_ day of _February_ , 2015, the following have been completed:

(1) The original of the State's Response to Appellant's Brief in the above numbered cause has been sent via electronic filing to the Clerk of the Court of Twelfth Court of Appeals.

(2) A legible copy of the State's Response to Appellant's Brief in the above numbered cause has been sent via electronic filing to:

Mr. James Huggler
Attorney at Law
100 E. Ferguson, Ste. 805
Tyler, Texas 75702

Michael J. West
Asst. Criminal District Attorney
Bar I.D. No. 21203300
100 N. Broadway, 4th Fl.
Tyler, Texas 75702
(903) 590-1720
(903) 590-1719 (fax)